UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
FILED
JUL 2 8 2005
AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 04-385-GWU

RAYMOND BAKER, PLAINTIFF,

VS. **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff seeks judicial review of an administrative decision terminating Disability Insurance Benefits (DIB) awarded in 1995. It is currently before the Court on cross-motions for summary judgment.

## STANDARDS APPLICABLE TO TERMINATION DECISIONS

When the issue is the termination of benefits, the Regulations establish the following eight-step test:

1. Is the beneficiary engaging in substantial gainful activity? If so, then the disability will be found to have ended. See 20 C.F.R. Section 404.1594(f)(1).

2. Provided the beneficiary is not engaged in substantial gainful activity, does the beneficiary have an impairment or combination of impairments which meet or equal the severity of impairments in the Listing? If so, then the disability must be found to continue. See 20 C.F.R. Section 404.1594(f)(2).

1

3. If the beneficiary does not equal a listing, then the question is whether there has been medical improvement (any decrease in the medical severity of one's impairments, as per 20 C.F.R. 404.1594(b)(1)).

4. Provided medical improvement has occurred, then the question is whether this has produced an increase in the residual functional capacity. If the improvement is not related to the ability to perform work activities, then one proceeds to step 5. If the improvement is related work ability, then one proceeds to step 6. See 20 C.F.R. Section 404.1594(f)(4).

5. Provided there has been no medical improvement or the improvement is not related to work ability, then one must decide whether an exception to the medical improvement standard will apply. If not, then a finding of continuing disability should be made. See 20 C.F.R. Section 404.1594(f)(5).

6. If the medical improvement is found to be related to work ability or if an exception to the medical improvement standard applies, then one considers whether the current impairments in combination are severe. If so, then one proceeds to step 7; if not, the beneficiary is no longer considered disabled. See 20 C.F.R. Section 404.1594(f)(6).

7. If the impairments are found to be severe, then one must assess the beneficiary's ability to engage in substantial gainful activity in accordance with 20 C.F.R. Sec. 404.1561. If found capable of performing past relevant work, then the disability will be found to have ended. Otherwise, one proceeds to step 8. See 20 C.F.R. Section 404.1594(f) (7).

8. Provided the beneficiary cannot perform past relevant work, then one must assess the residual functional capacity and considering the age, education, and past work experience, determine whether other work can be performed. If so, then the beneficiary is no longer disabled. Otherwise, a finding of continuing disability should be made. See 20 C.F.R. Section 404.1594(f)(8).

Baker

The standard for judicial review is whether there is substantial evidence to support the Secretary's decision that the plaintiff's condition has improved to the extent that he can perform substantial gainful activity. Casiano, Jr. v. Heckler, 746 F. 2d 1144 (6th Cir. 1984). The Court must determine from the record upon what conditions the claimant was awarded benefits, and whether there has been any improvement in these conditions. Id. at 1148.

## DISCUSSION

The plaintiff had been awarded benefits as a result of a September, 1995 decision by an administrative law judge (ALJ). The ALJ had found that the plaintiff was physically capable of a restricted range of light level work,[1] was not established to have had any mental health treatment, and overall was "not disabled" prior to November, 1994 (Tr. 41); based on the November 14, 1994 mental health evaluation report of Dr. Robert Dane, however, he had concluded that the plaintiff had a disabling mental impairment at that point and thereafter. (Tr. 41, 46).

---

[1] The ALJ appeared to take a middle ground between Consultative Examiner Neal Moser, who believed that the physical examination was unremarkable (Tr. 88), and Christa Muckenhausen, who believed that the patient was disabled (Tr. 113). Two physicians assessing the plaintiff's pulmonary disease issued lesser restrictions—a disability for mining and "comparable" employment (Tr. 119) or a need to avoid "manual labor" and certain environmental factors. (Tr. 126). Robert Dane, who diagnosed a dysthymic disorder, appears to have issued the only mental health evaluation report of record as of the date of the award decision. (Tr. 138-141).

3

Baker

and there does not appear to be regular treatment for pulmonary disease or hearing difficulties. (Tr. 250-254)[2]. More significantly, the record also shows that the plaintiff was seen at the Appalachian Regional Healthcare system in December, 1999 "for disability exam secondary to diabetes and low back pain" (Tr. 220); the conclusion of the examiner, Michael Vories, is that the plaintiff's diabetes was not functionally limiting and that the plaintiff's low back pain was only functionally limiting in terms of "sitting, standing for prolonged periods, but is made better by movement." (Tr. 221). Vories also stated that while there was *no* decrease of grip strength, although he also vaguely stated that "this is limited somewhat by the amputation of his first two fingers of his right hand." (Tr. 2002). No reference was made to the plaintiff's pulmonary system, except for finding that the plaintiff's lungs were clear and had no wheezing. (Tr. 220). Nine days after the proposed benefits cut-off point, a non-examining medical reviewer examining Vories' report was entitled to great weight and concluded that the plaintiff was capable of light level work with the ability to occasionally climb ladders, ropes and scaffolds, as well as to stoop, and crouch. (Tr. 240-247), which was ultimately cited to the VE (Tr. 418).

---

[2]The previous ALJ had cited the same physical <u>exertional</u> capacity (Tr. 43) as the present ALJ (Tr. 25), but had referred to non-exertional restrictions related to hearing difficulties and pulmonary problems (Tr. 41). In view of the fact that the plaintiff sought no treatment for these conditions in the interim, and did not mention hearing problems even in agency forms in 1999 and 2000 (e.g., Tr. 158, 202), it would appear that these conditions might be said to have been medically improved.

6

The agency subsequently decided to terminate benefits. In the latest full decision issued in September, 2002, the current ALJ found that there had been improvement in Baker's condition since 1995 (Tr. 26) and that this was related to the plaintiff's ability to work (Tr. 23). He believed that, beginning February 1, 2000, the plaintiff had the residual functional capacity to perform a limited range of light level work. (Tr. 27). Since the vocational expert (VE) was able to give examples of significant numbers of compatible jobs (Tr. 27-28), the ALJ held that the plaintiff's disability ceased February 1, 2000 (Tr. 28).

One major issue for this Court's review concerns whether there is substantial evidence of record to support the current ALJ's finding that there has been medical improvement regarding Baker's prior, major source of disability–the dysthymia diagnosed by Dr. Dane. Between the 1995 award date and the actual February, 2000 cut-off date, only one mental health evaluation was evidently performed. This was from Robert Fitz, who made no mental health diagnosis and cited a relatively high GAF of 65. (Tr. 228). He assessed the plaintiff to have "good" or "very good" functional abilities. (Id.) Based on this report, a non-examining medical reviewer opined that there was no medically determinable mental impairment. (Tr. 230). The aforesaid information alone would be enough to buttress the ALJ's determination that there has been improvement in the primary disabling condition as of the cut-off date and that it was related to the ability to work.

4

Baker

As to the period after the cut-off date in 2000, there is at least sufficient evidence to support a finding that there were functional mental impairments no more severe than were cited in the current hypothetical question given to the vocational expert. A 2002 mental health evaluation resulted in an even higher GAF being cited than had been mentioned by Fitz, and with the suggestion that Baker's mental condition did not have a significant impact on his ability to work. (Tr. 328). A testifying medical expert discounted the opinion voiced by Dr. Arthur Amador, who was a one-time evaluator entitled to no more weight than the 2002 evaluator. (Tr. 362, 403). While the plaintiff seen once for an evaluation by Ashok Jain, Jain's restrictions are somewhat confusing "disabled to hold any *significant* job" and "*moderately difficult* job" (Tr. 283); nor does it appear that Jain was entitled to great weight to be accorded an examiner who had a long-term treatment relationship established with the patient.

Although the plaintiff's physical condition played a lesser role in the original award of benefits, a review of the physical condition between 1995, when Baker was awarded benefits, and the selected benefits cut-off point in 2000, is in order. In 1999, Baker himself noted on one agency form that he had developed diabetes, and had been seeing Dr. Elmer Ratcliff for his physical problems between 1994 and 1999 (Tr. 148). Very brief, semi-legible progress notes from Dr. Ratcliff covering the period from December, 1997 to January, 2000 were submitted; none appear to cite functional restrictions or to provide much clinical data beyond blood sugar readings

5

The additional information about the plaintiff's physical status submitted for the period after the cut-off date confirms that the aforesaid physical limitations were adequate to describe Baker's physical functional capacity. The last of Dr. Ratcliff's 2000 notes described the plaintiff as "doing well" with no new complaints. (Tr. 249). An October, 2000 spirometric test was normal in result. (Tr. 274). A 2001 pulmonary evaluation mentioned only a mild impairment, and indicated that he could perform the work of a coal miner or comparable activity. (Tr. 293). There was evidently only a slight loss of lung volumn based on all testing. (Tr. 296). In 2002, Ratcliff served as the attending physician at a hospitalization for diabetes and kidney problems. Part of the patient history for the hospitalization indicates that the patient had been in "relatively good health" prior to that point. (Tr. 344). The lungs were clear and the neurological system was grossly normal. (Tr. 344-345). Baker's glucose came under good control, a KUB was normal, and a CT scan of the abdomen was not remarkable except for a incidentally noted hernia. (Tr. 347). No activity-related restrictions were mentioned.

The decision will be affirmed.

This the 28 day of July, 2004.

G. WIX UNTHANK
SENIOR JUDGE

7